PRESENT: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
Agee, JJ., and Compton, S.J.

TIMOTHY MARTIN BARRETT

                                          OPINION BY
v.   Record No. 042336            JUSTICE G. STEVEN AGEE
                                        April 22, 2005

VIRGINIA STATE BAR


          FROM THE VIRGINIA STATE BAR DISCIPLINARY BOARD

     This case presents an appeal of right from a ruling of the

Virginia State Bar Disciplinary Board ("the Board"). Timothy M.

Barrett challenges the Board's order of August 5, 2004,

suspending his license to practice law in the Commonwealth for a

period of three years based upon findings that Barrett violated

Rules 3.1, 3.4(i), 3.4(j), 3.5(e), 4.3(b), and 8.4(b) of the

Virginia Rules of Professional Conduct.[1]

>     In reviewing the Board's decision in a
>     disciplinary proceeding, we conduct an independent
>     examination of the entire record. We consider the
>     evidence and all reasonable inferences that may be
>     drawn from the evidence in the light most favorable to
>     the Bar, the prevailing party in the Board proceeding.
>     We give the Board's factual findings substantial
>     weight and view them as prima facie correct. While we
>     do not give the Board's conclusions the weight of a
>     jury verdict, we will sustain those conclusions unless
>     it appears they are not justified by a reasonable view
>     of the evidence or are contrary to law.

Williams v. Virginia State Bar, 261 Va. 258, 264, 542 S.E.2d

385, 389 (2001) (citations omitted).  A violation of

disciplinary rules must be established by clear proof.  See,

_____

     [1] The Board dismissed charges that Barrett violated Rules
4.2 and 4.4.


                              1

*e.g.*, Blue v. Seventh Dist. Comm., 220 Va. 1056, 1062, 265 S.E.2d 753, 757. We separately review each of the alleged Rule violations below.

## I. Rule 4.3(b)

Timothy M. Barrett and Valerie Jill Rhudy were married in 1990. Barrett was admitted to practice law in the Commonwealth of Virginia in 1996 and operates as a sole practitioner in the City of Virginia Beach. Rhudy served as his secretary during their marriage.

In the summer of 2001, Barrett and Rhudy separated. She took the couple's six children and moved from the marital home in Virginia Beach to her parents' home in Grayson County.

Rule 4.3(b) provides as follows:

> A lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interest of the client.

The Board found that Barrett violated this rule because it concluded certain statements in two electronic mail ("e-mail") communications he wrote to Rhudy after the separation, but before she retained counsel, constituted legal advice. On July 25, 2001, Barrett sent an e-mail to Rhudy containing the following:

> Venue will not be had in Grayson County. Virginia law is clear that venue is in Virginia Beach.

2

. . . .

Under the doctrine of imputed income, the Court will
have to look at your skills and experience and
determine their value in the marketplace. . . . You
can easily get a job . . . [making] $2,165.00 per
month. . . .

In light of the fact that you are living with your
parents and have no expenses . . . this income will be
more than sufficient to meet your needs. I . . . just
make enough to pay my own bills . . . Thus, it is
unlikely that you will . . . obtain spousal support
from me.

I . . . will file for . . . spousal support to have
you help me pay you [sic] fair share of our $200,000+
indebtedness. Since I am barely making it on my
income and you have income to spare, you might end up
paying me spousal support. . . .

In light of the fact that . . . I . . . am staying in
the maritial [sic] home . . . I believe that I will
obtain the children. . . . [Y]ou will have to get a
job to pay me my spousal support. . . . The Court will
prefer the children staying with a [parent], . . .
there is no question that I can set up a home away
from home and even continue to home school our kids.
Therefore, it is likely that you will lose this fight.
And of course, if I have the kids you will be paying
me child support. . . .

I am prepared for the fight.

("July e-mail").

Barrett sent Rhudy another e-mail on September 12, 2001, in

which he included the following: [2]

I will avail myself of every substantive law and
procedural and evidentiary rule in the books for which
a good faith claim exists. This means that you, the

---

[2] On July 30, 2001, Rhudy retained attorney Karen Loftin of
Galax, Virginia to represent her, but Loftin notified Barrett
that she had withdrawn from representation on August 10, 2001.

kids and your attorney will be in Court in Virginia
Beach weekly. . . [Y]ou are looking at attorney's
expenses that will greatly exceed $10,000. . . . I
will also appeal . . . every negative ruling . . .
causing your costs to likely exceed $30,000.00. . . .

You have no case against me for adultery . . . .  [The
facts] show[] that you deserted me. . . . [Y]our e-
mails . . . show . . . that you were cruel to me.
This means that I will obtain a divorce from you on
fault grounds, which means you can say goodbye to
spousal support. . . .

I remain in the marrital [sic] home . . . I have all
the kids [sic] toys and property, that your parents'
home is grossly insufficient for the children, that I
can home school the older kids while watching the
younger whereas you will have to put the younger in
day care to fulfill your duty to financially support
the kids, I believe that I will get the kids no
problem. . . .

[T]he family debt . . . is subject to equitable
distribution, which means you could be socked with
half my lawschool [sic] debt, half the credit care
[sic] debt, have [sic] my firm debt, etc.

("September e-mail").

The foregoing e-mail passages were interwoven with many
requests from Barrett to Rhudy to return home, professing his
love for her and the children and exhorting Rhudy for reasons of
faith to reunite the family because it was God's will.  For
example, the September e-mail included the following:

You know that it is God's will that we be reconciled
. . . .  I am begging you again to forgive me as God
forgives you, to give me that 1000th chance He gave
you today, to start over with me with a clean slate,
to come home.

4

In finding that Barrett gave unauthorized legal advice to an unrepresented person in violation of Rule 4.3(b), the Board opined that "Barrett cannot send those two e-mails stating what he did." Barrett contends that Rule 4.3(b) was not meant to bar communications between a husband and wife, and that construing it as such interferes with the sanctity of marriage. He further contends the e-mails only stated his opinions and were not advice to Rhudy.

Prior decisions of the Board reveal that conduct usually found to be in violation of Rule 4:3(b) is much more egregious than Barrett's conduct in this case. In October 1990, the Board entered an order suspending the license of Grant Paul Jones. In re Jones, VSB Docket No. 87-070-1177 (Oct. 17, 1990).[3] The Board found that Jones had provided family counseling to the complainant's family through his church. Complainant's ex-husband was charged with incest and Jones agreed to represent him on the criminal charge. Jones paid an unannounced visit to the complainant and her daughter, and without disclosing that he represented the father in the criminal proceedings, he held a "counseling" session with them, designed to elicit incriminating testimony. While this conduct unquestionably violated the

---

[3] This order became the subject of a District of Columbia Court of Appeals case in which that Court reviewed the Board's decision to determine if reciprocal sanctions were warranted against Jones in the District of Columbia. See In re Jones, 599 A.2d 1145, 1147-48 (D.C. 1991).

5

Rules, the Board particularly found Jones in violation of former DR 7-103(A)(2), the predecessor of Rule 4.3(b), when he returned to the unrepresented complainant to advise her as to how she should respond to inquiries that might be directed at her concerning the "counseling" session.

While Jones did not appeal the Board's decision to this Court, we note that his conduct in that case was the type Rule 4.3(b) is intended to prohibit. Comment [1] to Rule 4.3 of the Virginia Rules of Professional Conduct cautions that "[a]n unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law."

Jones, without disclosing his representation of the husband, gave specific legal advice to an adverse party. The complainant had no reason to believe that Jones, who had also been her counselor, represented interests adverse to hers. In the case at bar, however, Barrett expressed only his opinion that he held a superior legal position on certain issues in controversy between himself and Rhudy. His statements may have been intimidating, but he did not purport to give legal advice. Rhudy knew that Barrett was a lawyer and that he had interests opposed to hers. We find that the concern articulated by the Comment to Rule 4.3 is not borne out in this case.

While the Bar argues that there is no "marital" exception to Rule 4.3(b), neither does it ask us to set out a per se rule that all communication by a lawyer, to his or her unrepresented spouse in a divorce proceeding discussing legal issues pertinent to the divorce, is prohibited under Rule 4.3(b). We do not find there is such a per se rule, but it is otherwise unnecessary for us to address that point because upon our independent review of the entire record, we find that there was not sufficient evidence to support the Board's finding that Barrett's e-mail statements to Rhudy were legal advice rather than statements of his opinion of their legal situation. Therefore, we will set aside the Board's finding that Barrett violated Rule 4.3(b).

## II. Rule 3.4(j)

Rule 3.4(j) provides that a lawyer may not

> [a]ssert a position, conduct a defense, delay a trial, or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

The Board found Barrett in violation of Rule 3.4(j) based on his correspondence with Rhudy's attorney and his filing of motions without prior notice to the court, contrary to a prior court order. We will affirm the Board's disposition that Barrett violated Rule 3.4(j) by his harassing statements to Rhudy's attorney, but we do not find sufficient evidence to support the Board's finding that Barrett acted in violation of the Rule by

7

violating a trial court order requiring notification before filing motions.

In the fall of 2001, Rhudy retained Lanis L. Karnes to represent her in the divorce proceedings in Virginia Beach Circuit Court. For several months thereafter in numerous letters, Barrett wrote to Karnes but referred to her by her former married name of "Price." Barrett testified that he did not believe Karnes had the right to change her name based upon his religious beliefs. According to Barrett, referring to Karnes by her former husband's name was a way to honor Karnes' former husband. Barrett indicated to the Board's investigator that it was a means for him to protest Karnes' role as Rhudy's counsel. Additionally, Barrett's letters to Karnes contained the following comments:

> Words cannot express the disappointment I feel towards you, one who ostensibly claims Christ as her savior, in that you would represent one Christian in their suit against another, let alone a wife verses [sic] a husband, in violation of the Word of God . . . causing that Word to be defamed. . . . Shame on you.

> Please pass on to your client the fact that it has not escaped my notice the irony that my wife, who just weeks ago was feigning contempt for the feminism of her friends, has retained one of the worst examples of "Christian" feminism ever to pollute the campus of Regent University. You two will make a lovely pair.

> I look forward to hearing from you shortly as to the matters raised in this letter and seeing you this Friday for the beginning of what will be a series of hearings that will not conclude until the Virginia

Supreme Court has passed on the matter of <u>Barrett v. Barrett.</u>

[Y]ou are inept. . . . I beg you to start zealously representing your client with competence and stop wasting her money and my time.

According to the commentary accompanying Rule 3.4(j), the Bar is concerned with "conduct that could harass or maliciously injure another" such that it "bring[s] the administration of justice into disrepute."  Comment [6], Rule 3.4.  Additional comments describe the conduct the Rule was designed to prohibit:

The duty of [a] lawyer to represent a client with zeal does not militate against his concurrent obligation to treat, with consideration, all persons involved in the legal process and to avoid the infliction of needless harm. . . .

In adversary proceedings, clients are litigants and though ill feeling may exist between the clients, such ill feeling should not influence a lawyer's conduct, attitude or demeanor towards opposing counsel. A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.

Comments [7]-[8], Rule 3.4.

Barrett's foregoing statements to Karnes did not address the legal issues in the divorce action, but personally attacked opposing counsel.  Karnes testified that she found these comments to be "offensive and derogatory."  By his own admission, Barrett referred to Karnes by her former married name "as a way of protest."

Barrett argues that Rule 3.4(j) does not apply to communications between lawyers, but merely addresses actions taken, not words used, in the litigation context. We disagree. A preponderance of authorities interpreting the model rule upon which former DR 7-102(A)(1) was based, and from which Rule 3.4(j) was derived, have found that harassing ad hominem attacks on opposing counsel are prohibited under the Rule. See, e.g., Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1323 (11th Cir. 2002); In re Vollintine, 673 P.2d 755, 758-59 (Alaska 1983).

> We agree with the Supreme Court of Kansas that

> [a]ttorneys are required to act with common courtesy
> and civility at all times in their dealings with those
> concerned with the legal process. . . . An attorney
> who exhibits the lack of civility, good manners and
> common courtesy . . . tarnishes the entire image of
> what the bar stands for.

In re Gershater, 17 P.3d 929, 935-936 (Kan. 2001) (citations omitted). There is sufficient evidence in the record to support the Board's finding that Barrett's comments to Karnes were "other action" under Rule 3.4(j) meant to harass her in her capacity as Rhudy's attorney.

However, we find that the Board erred in determining a violation of Rule 3.4(j) on the basis of motions alleged to have been filed without first notifying the trial court, in violation of a prior order. On January 24, 2002, Judge H. Thomas Padrick, Jr., of the Virginia Beach Circuit Court, entered an order

10

requiring Barrett and Karnes to "arrange a conference call with the Court to discuss any relevant issue," and that this was to be done "prior to filing a motion." The Board found that despite this order, Barrett "attempted to file numerous motions in a hearing before Judge Shockley of the Circuit Court of the City of Virginia Beach without any prior conference call with the court."

There are no motions in the record dated after Judge Padrick's January 24, 2002, order. The only evidence to substantiate the Board's finding is Karnes' testimony that Barrett "tried to circumvent that order and began filing things with Judge Shockley." There is nothing in the record to show what "things" Barrett is alleged to have filed or how the "things" violated Judge Padrick's order. The record contains no evidence that any alleged action by Barrett in violation of the order was ever brought to the attention of the trial court.

Without actual proof of the motions filed in violation of the order, we cannot agree that the Board's finding that Barrett violated Rule 3.4(j) on this ground is "justified by a reasonable view of the evidence." Williams, 261 Va. at 264, 542 S.E.2d at 389. Because we find that there was sufficient evidence that Barrett intended to harass Karnes, we will approve the Board's determination of misconduct under Rule 3.4(j) on that ground, but will set aside that portion of the Board's

11

Order under that Rule which was based on violating Judge Padrick's order of January 24, 2002.

### III. Rule 3.4(i)

The Board found Barrett violated Rule 3.4(i), which prohibits lawyers from "present[ing] or threaten[ing] to present criminal or disciplinary charges solely to obtain an advantage in a civil matter." In the course of his correspondence with Karnes, Barrett threatened her with a disciplinary complaint or sanctions four times.

> I also ask that you stop attempting to deceive the court in your pleadings . . . . [T]his conduct violates Rule 3.3 of the Rules of Professional Conduct. If you insist on continuing this unethical conduct, I will seek to have you disbarred.

> Should you continue to present motions that lack a firm foundation in the law and display an utter lack of proofreading, I will continue to file for sanctions pursuant to Section 8.01-271.1 of the Code of Virginia.

> [S]hould you not immediately begin to proofread your letters/pleadings to insure [sic] both textual accuracy and legal faithfulness, I will report you the Virginia State Bar for your violation of Rule 1.1 of the Rules of Professional Conduct. [sic]

> Please send me a letter informing me as to how you can ethically justify charging your client for the time you will be traveling across the states of Virginia and Tennessee instead of advising her to retain local counsel? [sic] I ask since your conduct appears to be in violation of Rule 1.5 of the Rules of Professional Conduct as to the reasonableness of fees.

Barrett testified that he believed "typographical errors are a basis for a Bar complaint." While he did not file a complaint

12

against Karnes, he did make a motion for sanctions based on typographical errors, which was denied.  Barrett argues, however, that these "threats" were not made "solely to obtain an advantage in a civil matter."  We disagree.

We find that the succession of threats without a good faith basis supports the Board's conclusion that Barrett made these statements "solely to obtain an advantage" in his divorce proceeding.  It is clear from Barrett's letters that his motivation in threatening Karnes with sanctions and disciplinary complaints was to force her to withdraw from representing Rhudy.  Barrett admits as much in letters to Karnes:

> I did indirectly threaten you with a malpractice action over the incompetent way you have handled this matter thus far.  I did this to encourage [Rhudy] that she can retrieve from you the money she has wasted on your services to date and to save me from her appeal on the basis of inadequacy of counsel.
>
> I ask that you either familiarize yourself with this area of the law and present pleading [sic] that are in conformity with the law or comply with your duties under Rule 1.1 and withdraw as counsel in this matter.
>
> Please advise [Rhudy] not to call me again unless she has terminated you.

Indeed, Barrett testified that he "was terribly upset that Ms. Barrett had gotten Ms. Karnes involved in [the] case" because he "knew that Ms. Karnes had it in for [him]."  Thus, we find the evidence sufficient to support the Board's finding that Barrett threatened Karnes with disciplinary complaints in order to obtain

13

an advantage in the divorce and custody proceedings in violation of Rule 3.4(i).

## IV.  Rule 3.1

Rule 3.1 provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous."  On October 19, 2001, Barrett filed a motion to strike the pleadings asserting that he did not know and was not married to the plaintiff, Valerie Jill Rhudy Barrett.  Barrett asked that the pleadings be stricken, that the case be dismissed and that he be awarded costs.  The motion was denied.  Barrett testified before the Board that he filed the motion because "Valerie Jill Barrett is Jill's legal name, not Valerie Jill Rudy [sic] Barrett."

Barrett argues that the Board's Order of Suspension does not state a basis for determining that the motion was frivolous and that the filing of the motion was never specifically connected to the Board's conclusion that he violated Rule 3.1.  Although the Board's Order does not directly tie the Rule 3.1 violation to the motion to strike the pleadings, we find that the record clearly supports a finding that Barrett violated the Rule.

Barrett's motion to strike the pleadings is the only pleading which the Bar argues proves its contention that he violated Rule 3.1.  The Bar argued that Barrett clearly knew Rhudy's maiden name, and that Barrett himself used multiple versions of Rhudy's

14

name in his own motions.  This obviates Barrett's claim that he was concerned with consistency in the pleadings.  Thus we find that the record supports the Board's finding that Barrett violated Rule 3.1.

V.  Rule 3.5(e)

Rule 3.5(e) prohibits ex parte contact by lawyers with the court:

> In an adversary proceeding, a lawyer shall not communicate . . . as to the merits of the cause with a judge . . . except: . . . (2) in writing if the lawyer promptly delivers a copy of the writing to opposing counsel.

On April 2, 2002, Barrett sent a letter to Judge Padrick arguing that Rhudy was unfit to have custody of the children and that he should be awarded custody.  The letter indicates that copies were sent to the children's court-appointed psychologist and the guardian ad litem.  There is no indication that the letter was sent to Karnes.  Karnes testified that she first became aware of the letter after a telephone call from the court.

Barrett's counsel admitted to the Board that he could not "say categorically that [Barrett] sent [the] letter to [Karnes]."  On appeal, Barrett declined to ask this Court to set aside the Board's finding as to his violation of Rule 3.5(e).  Thus, we will affirm the Board's finding that Barrett violated Rule 3.5(e) for an ex parte communication with the trial court.

VI.  Rule 8.4(b)

15

In November 2001, Judge Shockley entered an order in the Virginia Beach Circuit Court requiring Barrett to pay $1704 per month in child support. In February 2002, Judge Padrick entered another order requiring Barrett to pay Rhudy $1000 per month in spousal support. Between November 2001 and July 2004, Barrett missed ten payments and made six payments in amounts less than the monthly amount due. When Barrett did make payments, he often paid in excess of the monthly amount due in order to make up arrearages. Barrett testified that he "paid when [he] had the ability" and that he never had "a willful desire to [disregard the child support order]."

On August 14, 2002, Judge Padrick found Barrett in contempt of court for failure to timely pay his support obligations. On March 24, 2003, Judge Tompkins of the Grayson County Juvenile and Domestic Relations District Court also held Barrett in contempt for failure to pay child support. Both contempt orders sentenced Barrett to confinement in jail, but were suspended upon condition he pay the arrearages. On the basis of these two contempt charges, the Board found Barrett in violation of Rule 8.4(b).[4] In so finding, the Board cited Barrett's ability to make $900 monthly

---

[4] On argument before this Court, the Bar conceded that it did not seek a rule that contempt of court for failure to pay child support is per se a violation of Rule 8.4(b). We do not find there is such a per se rule, but it is unnecessary to further address that point because we resolve the issue of violating Rule 8.4(b) on other grounds.

payments on a new Corvette sports car from October 2001 through April 2004 and his representation that he would lose $1400 per day if he had "to travel from Virginia Beach to Grayson County for court proceedings."

Rule 8.4(b) states that "[i]t is professional misconduct for a lawyer to: . . . commit a criminal or deliberately wrongful act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law."  Barrett maintains that a finding of contempt for failure to meet his support obligations does not constitute a criminal act in this case, was not a deliberately wrongful act and does not necessarily reflect adversely on his honesty, trustworthiness or fitness to practice law.

In response, the Bar cites Code § 63.2-1937, which includes lawyers in the class of state-licensed professionals who can lose their licenses for failing to pay child support.  Thus, the Bar argues that consistency with the statutory obligations requires a finding that Barrett's failure to meet his support obligations in conjunction with his ownership of the Corvette was a deliberate, wrongful act reflecting adversely on his trustworthiness and fitness to practice law.

There is nothing in the record to show Barrett was guilty of criminal contempt as opposed to civil contempt.  Thus, we must examine the record to determine whether, in this case, the Bar proved that Barrett's contempt convictions were the result of a

17

"deliberately wrongful act," i.e. disregarding his obligation to pay child support, which reflects adversely on his honesty, trustworthiness and fitness to practice law. We find that connection lacking on this record.

Barrett testified that he purchased the Corvette in October of 2001, a month before his support obligations began, and then unsuccessfully attempted to sell the car. He also missed several car payments, and maintains that he never missed a support payment so he could make a car payment.

Barrett also argues that his representation that he would lose $1400 per day if he were compelled to attend court proceedings in Grayson County, was not based on actual earnings, but on his billable rate of $175.00 per hour over an eight hour day, although he primarily operates on a contingent fee basis. The Bar presented no evidence that Barrett earned $1400 daily, or what law practice expenses would be paid from such earnings. Barrett provided the only evidence as to his financial situation. Thus, we find that there is no basis for the Board's reliance on the supposition that Barrett had the ability to pay his support obligations because he earned $1400 per day.

The Bar presented no evidence that Barrett's failure to pay child and spousal support was willful or intentional. Barrett showed that he made payments when he settled cases and received his contingency fee, which is the nature of his law practice. He

18

also maintained that he never made payments on the promissory note he obtained to purchase the Corvette when he could not make his support payments. Barrett also testified he tried to sell the Corvette but "could not liquidate it for whatever [he] owed on it." To make his support payments, Barrett had to borrow money from his grandmother. Eventually, Barrett filed for bankruptcy. The Bar presents no evidence to the contrary. Thus, we do not find sufficient evidence in the record to support a finding by the Board of a "deliberately wrongful act" within the meaning of Rule 8.4(b).

Further, the Bar did not establish a nexus between the failure to pay child support and Barrett's fitness to practice law. Instead the Bar relied upon conclusory statements:

> [I]n terms of relating [the contempt charge] to Mr. Barrett as an attorney, the contempt finding is a finding . . . that he could have . . . abided by a court order and failed to do so. Surely that reflects on his fitness to practice, if not his trustworthiness.

The required nexus between the contempt convictions and Barrett's honesty, trustworthiness and fitness to practice law has not been established by these conclusory statements. We will therefore set aside the finding of the Board that Barrett violated Rule 8.4(b).

## VII. Conclusion

The Board's suspension order of Barrett's license to practice law for three years was based on Barrett's violations of Rule 3.1, Rule 3.4(i), Rule 3.4(j), Rule 3.5(e), Rule 4.3(b), and Rule

19

8.4(b).  For the reasons set forth above, we will set aside the Board's determination that Barrett violated Rule 4.3(b), Rule 8.4(b), and Rule 3.4(j), in part.  We will affirm that portion of the Board's Order that Barrett violated Rule 3.1, Rule 3.4(i), Rule 3.5(e), and Rule 3.4(j), in part.

Accordingly, the Order of the Board, dated August 5, 2004, will be affirmed in part, reversed in part, and the case will be remanded for reconsideration of any sanction for Barrett's violations of Rule 3.1, Rule 3.4(i), Rule 3.5(e), and Rule 3.4(j), in part.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>

JUSTICE KEENAN, with whom CHIEF JUSTICE HASSELL and SENIOR JUSTICE COMPTON join, concurring in part and dissenting in part.

I respectfully dissent from the majority's holding that Barrett did not violate Rule 4.3(b).  In my opinion, the majority's holding effectively creates a "spousal exception" to the Rule and permits a lawyer to engage in otherwise prohibited conduct dispensing legal advice as long as the lawyer's spouse, rather than an unrelated person, is the affected pro se party. I also dissent from the majority's holding that Barrett did not violate Rule 8.4(b) which, among other things, recognizes as professional misconduct any deliberately wrongful act that reflects on a lawyer's trustworthiness.  I would hold that

Barrett violated this Rule by twice being held in contempt of court for nonpayment of court-ordered support. I concur in the balance of the majority's opinion.

In reaching its conclusion that Barrett did not violate Rule 4.3(b), the majority states that Barrett "did not purport to give [his wife] legal advice." A brief review, however, of the statements considered by the majority leads me to the opposite conclusion.

In his statements to his estranged wife, Barrett advised her that under Virginia law, all court proceedings would be held in Virginia Beach. With regard to the issue of spousal support, Barrett explained that the court would employ the legal doctrine of imputed income to determine the value of her skills and experience "in the marketplace."

Barrett further stated that "spousal support is based on the maxim [of] . . . the needs of the one versus the other's ability to pay." Citing facts relating to the parties' situation, Barrett then offered his judgment that it was "unlikely" that his wife would be able to obtain court-ordered support. With regard to the issue of child custody, Barrett told his wife that the "court will prefer the children staying with a [parent]," rather than with a substitute caregiver during working hours.

I would hold that these explanations constituted legal advice intended to influence the conduct of a party who had conflicting legal interests and who was not represented by counsel. Without question, Barrett's conduct would have been a violation of Rule 4.3(b) had he communicated this advice to a pro se litigant whose spouse Barrett was representing. Thus, the majority's conclusion necessarily implies that there is a "spousal exception" to Rule 4.3(b), under which an attorney may attempt to influence his or her spouse's conduct by imparting legal advice in a harassing manner regarding the parties' conflicting legal interests.

Such a conclusion, however, is contrary to the plain language of Rule 4.3(b), which provides no "spousal exception." Moreover, Barrett's use of legal advice as a "sword" in his marital conflict is clearly a type of conduct that Rule 4.3(b) is designed to discourage. It is hard to imagine a situation in which an attorney would be in a stronger position to improperly influence another's conduct by giving legal advice.

With regard to Barrett's alleged violation of Rule 8.4(b), the majority states that the Bar "presented no evidence that Barrett's failure to pay child and spousal support was willful or intentional." The majority fails to explain why findings by two judges, holding Barrett in contempt of court and imposing suspended jail sentences for his failure to comply with court

orders, is not evidence of deliberately wrongful conduct reflecting adversely on Barrett's trustworthiness.

Contempt findings manifest more than a mere arrearage in court-ordered support payments, which can result even when a person is doing everything possible to comply with a court order. The contempt findings and suspended jail sentences imposed in Barrett's case necessarily reflect the judges' conclusions Barrett was not diligently attempting to meet his support obligations, and that his explanations for failing to do so were incredible or otherwise unacceptable. I would hold that these repeated contempt findings are sufficient evidence to support the Board's conclusion that Barrett violated Rule 8.4(b).

Therefore, I would conclude that the Bar's findings that Barrett violated Rules 4.3(b) and 8.4(b) are supported by a reasonable view of the evidence and are in accordance with the law. See Williams v. Virginia State Bar, 261 Va. 258, 264, 542 S.E.2d 385, 389 (2001); Myers v. Virginia State Bar, 226 Va. 630, 632, 312 S.E.2d 286, 287 (1984).