MIRO TOOL & MFG., INC., Plaintiff-Appellant,

v.

MIDLAND MACHINERY, INC., Defendant-Respondent.

Court of Appeals

*No. 95–2785. Submitted on briefs September 3, 1996.—Decided October 23, 1996.*

(Also reported in 556 N.W.2d 437.)

On behalf of the plaintiff-appellant, the cause was submitted on the brief of *Scott V. Lowry* of Waukesha.

On behalf of the defendant-respondent, the cause was submitted on the brief of *John Staks* of Milwaukee.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

NETTESHEIM, J. Miro Tool & Mfg., Inc. appeals from a nonfinal order which granted Midland Machinery, Inc.'s motion to reopen a default judgment previously awarded to Miro.[1] The trial court ruled that the one-year time limitation of § 806.07(2), STATS., was tolled because of certain representations made by Miro to Midland at a meeting in February 1994. Alternatively, the court held that Miro was estopped by its conduct from asserting the one-year limitation. Miro claims the trial court lacked authority to reopen the judgment after the one-year limitation period. We agree and therefore reverse the trial court's order.

## BACKGROUND

The relevant facts are not disputed. In 1993, Midland ordered fixtures and tooling from Miro. On January 26, 1994, Miro served a summons and

---

[1] We have previously granted Miro's petition for leave to appeal the trial court's nonfinal order reopening the default judgment.

complaint upon Midland, seeking payment for the materials supplied. Because the parties' attorneys had previously been discussing the matter, Midland's personnel assumed that Miro's attorney would advise Midland's attorney that a lawsuit had been commenced. Therefore, Midland did not notify its attorney of the action. As a result, Midland did not appear in the action and on February 17, 1994, the trial court awarded Miro a default judgment. Four days later, unaware that a default judgment had already been entered, Midland's attorney learned of the action and filed an answer. The answer alleged, inter alia, that the materials did not conform to the requirements of the purchase order and were not timely delivered.

On February 28, 1994, the parties met in an attempt to resolve their differences. During this meeting, Midland first learned that a default judgment had been awarded to Miro. According to an affidavit of Michael Ryan, a financial officer for Midland, Miro representatives advised Midland at this meeting that Miro would not pursue the default judgment and would, instead, seek to resolve the matter by negotiations. At this meeting, the parties agreed that the fixtures would be returned to Miro for testing to determine if they complied with the purchase order. Relying on this understanding, Midland took no immediate action to reopen or set aside the default judgment. Further negotiations between the parties proved fruitless.

On February 23, 1995, more than one year after the default judgment had been entered, Miro filed a garnishee summons and complaint against Midland and a banking institution. In response, on March 16,

Midland filed a motion to reopen and vacate the default judgment. Midland relied on § 806.07(1)(h), STATS.[2]

Following a hearing on Midland's motion, the trial court issued the first of three decisions in this matter. The court denied relief to Midland under § 806.07(1)(h), STATS., ruling that Midland had not satisfied the extraordinary circumstances test of *State ex rel. M.L.B. v. D.G.H.*, 122 Wis. 2d 536, 363 N.W.2d 419 (1985). However, the court ruled that Midland was nonetheless entitled to relief under subsec. (1)(a) of the statute which allows the court to relieve a party from a judgment on grounds of "mistake, inadvertence, surprise, or excusable neglect."

The trial court reasoned that the representations made by Miro to Midland at the February 28, 1994, meeting satisfied § 806.07(1)(a), STATS. The court's written decision stated:

> [T]his assumption was an honest mistake by the defendants, the kind a reasonably prudent person might make. Indeed, from the court's perspective and from a professional standpoint, information about the lawsuit should have been provided to [Midland's attorney] as well as information concerning the request for the default judgment.... [T]he officers of [Midland] made an honest an [sic] erroneous assumption concerning the professional courtesies lawyers would extend to each other.

---

[2] Actually, Midland's motion did not identify the specific statutory basis for its motion, nor does the transcript of the motion hearing. However, the trial court's decision states that Midland relied on § 806.07(1)(h), STATS., the extraordinary circumstances provisions of the statute. Midland does not dispute this statement by the trial court, and we accept it.

In response to this ruling, Miro moved for reconsideration. In support, Miro pointed out that relief under § 806.07(1)(a), STATS., must be sought within a reasonable time and, in any event, "not more than one year after the judgment was entered" pursuant to § 806.07(2). Noting that Midland's motion to reopen the judgment was brought beyond the one-year limitation, Miro asked the court to reverse its ruling.

In response, the trial court issued its second decision. The court first confirmed its earlier ruling that Midland had failed to meet the extraordinary circumstances test under subsec. (1)(h), but had satisfied the excusable neglect test under subsec. (1)(a). The court then addressed Miro's time limit argument. The court reasoned that Miro's conduct served to toll the time limits under § 806.07(2), STATS. Alternatively, the court held that Miro was estopped by its conduct from invoking the time limitations of the statute.

This ruling prompted Miro to seek further reconsideration. In support, Miro likened this case to *Johnson v. Johnson*, 179 Wis. 2d 574, 583, 508 N.W.2d 19, 22 (Ct. App. 1993), where this court held that the plaintiff had failed to demonstrate sufficient facts to estop the defendant from defending on the basis of a statute of limitations in a personal injury action. In its third decision, the court disagreed, ruling that *Johnson* actually supported the court's ruling. Miro appeals.

## DISCUSSION

■■■■■

A motion to vacate a default judgment is addressed to the sound discretion of the trial court, and this court will not disturb the trial court's determination absent

an erroneous exercise of that discretion. *Baird Contracting, Inc. v. Mid Wis. Bank*, 189 Wis. 2d 321, 324, 525 N.W.2d 276, 277 (Ct. App. 1994). Here, however, the controlling question is one of statutory construction: whether a trial court may grant relief pursuant to § 806.07(1)(a), STATS., when such motion is filed beyond the one-year time limitation of § 806.07(2). Statutory construction presents a question of law which we review without deference to the trial court's holding. *Goff v. Seldera*, 202 Wis. 2d 601, 617, 550 N.W.2d 144, 151 (Ct. App. 1996).

We have searched unsuccessfully for any authority which allows a trial court to extend the time limit imposed by § 806.07(2), STATS., when the grounds for relief are mistake, inadvertence, surprise or excusable neglect. Nor has Midland directed us to any such authority. Moreover, the language of the case law in other contexts suggests that the circuit court has no such power.

Prior to the adoption of § 806.07, STATS., in 1976, the statute governing relief from judgments, § 269.46(1), STATS., 1973, provided that:

> The court may, upon notice and just terms, at any time *within one year* after notice thereof, relieve a party from a judgment, order, stipulation or other proceeding against him obtained, through his mistake, inadvertence, surprise or excusable neglect . . . . [Emphasis added.]

Construing this predecessor statute, the Wisconsin Supreme Court held that "[i]t is clear under sec. 269.46(1), STATS., that a court does not have the authority to open or vacate a judgment on the grounds enumerated in the statute if more than one year has passed after notice of the judgment to the party seeking

relief." *State ex rel. Green v. Williams*, 49 Wis. 2d 752, 757, 183 N.W.2d 37, 40 (1971).

Following the adoption of the present statute in 1976, the Wisconsin Supreme Court has similarly reasoned that the one-year time limitation of § 806.07(2), STATS., "constitutes the maximum time allowed or a 'statute of limitations' period for bringing the motion to vacate on the grounds of mistake, surprise, inadvertence or excusable neglect." *Rhodes v. Terry*, 91 Wis. 2d 165, 171, 280 N.W.2d 248, 251 (1979); *see also State ex rel. Cynthia M.S. v. Michael F.C.*, 181 Wis. 2d 618, 630-31, 511 N.W.2d 868, 873 (1994).

The trial court concluded that cases such as *Johnson* establish that a court may use estoppel to toll the time limits of § 806.07(2), STATS. However, those cases deal with classic statute of limitations governing the *commencement* of an action. *See, e.g., Johnson*, 179 Wis. 2d at 577-78, 508 N.W.2d at 20. We think it entirely proper to bar a party from invoking a statute of limitations defense when such party has contributed to the claimant's tardy filing.

Here, however, we deal with a time limitation for reopening a case *already reduced to judgment*. Regardless of Miro's role in this case, the hard facts remain that Midland allowed a default judgment to be taken against it and then allowed that judgment to endure for over one year before taking any remedial action.

Unlike statutes of limitations which govern the commencement of actions, requests for relief under § 806.07, STATS., invoke special policy considerations. That policy seeks to balance the competing values of finality against fairness in the resolution of a dispute. *M.L.B.*, 122 Wis. 2d at 542, 363 N.W.2d at 422. The legislature has accomplished this task by setting one

year as the maximum time for seeking relief under subsec. (1)(a).

If there be any question about this, § 806.07(1)(c), STATS., provides the final answer. This subsection allows relief in circumstances of fraud, misrepresentation or other misconduct of an adverse party. Such conduct will often (perhaps always) constitute grounds for estoppel. Yet, relief under this subsection is also governed by the one-year maximum limit set out in subsec. (2). Thus, in these most egregious of situations, the legislature has clearly set out a one-year time limit. But Midland's interpretation would have us toll the time limit in circumstances involving the less egregious circumstances under subsec. (1)(a). That, we conclude, would be an unreasonable interpretation of the statute.[3]

## CONCLUSION

We conclude that the one-year maximum time limit set out in § 806.07(2), STATS., cannot be tolled or extended under any circumstances for purposes of relief under § 806.07(1)(a). We reverse the trial court's nonfinal order. We remand with directions to reinstate the default judgment.

*By the Court.*—Order reversed and cause remanded with directions.

ANDERSON, P. J. (*concurring*). I write separately to lament the untimely demise of common courtesy in the legal profession. The factual background of this

---

[3] If Midland's rejoinder is that tolling should also apply to a "fraud, misrepresentation or other misconduct" situation, then the one-year limitation becomes meaningless since, as we have observed, estoppel would lie in nearly all such situations.

case is but one example of the hostile environment that is the leading cause of the collapse of common courtesy.

Despite knowing that Midland was represented by counsel and despite having negotiated with counsel in an attempt to resolve the dispute between the parties, counsel for Miro did not extend any common courtesy to counsel for Midland. Miro's counsel did not notify opposing counsel that a lawsuit was being commenced against Midland; did not send opposing counsel a courtesy copy of the summons and complaint; did not ask opposing counsel if an answer was forthcoming; and did not warn opposing counsel that a default judgment would be taken.

I understand that the Rules of Civil Procedure do not require notice to opposing counsel that a lawsuit was commenced or that a default judgment is going to be requested. However, I believe that common courtesy imposes such an obligation. Here, the failure to extend a common courtesy has resulted in the considerable expense of time and money by both parties. Midland, having retained counsel to negotiate the dispute with Miro, rightfully expected that its counsel would respond to the lawsuit; little did it know that counsel for Miro failed to extend a common courtesy to Midland's counsel. Midland's naive expectation resulted in an untimely answer being filed by its counsel.[1]

The events that followed the granting of the default judgment compound the problem. With a default judgment in hand, Miro hosted a meeting of representatives of Miro and Midland, along with their

---

[1] On February 21, 1994, Midland ultimately learned that its attorney was unaware of the lawsuit; counsel filed an answer on February 22, five days after the default judgment was granted.

attorneys, to discuss how to verify and determine whether the fixtures manufactured by Miro were capable of performing to the specifications. It was at this meeting, eleven days after Miro took the default judgment, that Midland learned, for the first time, that there was a judgment against it. Also at this meeting, Miro assured Midland that if the terms of the agreement were carried out it would not execute on the default judgment. Based upon this representation, Midland instructed its counsel not to take any further action with respect to the litigation. Midland took steps to fulfill its obligations under the agreement. Thus, it came as a complete surprise to Midland when a garnishment action was commenced.

Common courtesy in the legal profession is not memorialized in the statutes, Rules of Professional Conduct for Attorneys or the recently adopted Standards of Courtesy and Decorum for the Courts of Wisconsin. Indeed, it is obvious that there should not be a need to have a rule that counsel will treat each other with respect and courtesy.[2]

---

[2] There have been efforts to provide rules requiring attorneys to practice courtesy. In *State v. Rossmanith,* 146 Wis. 2d 89, 90 n.7, 430 N.W.2d 93, 94 (1988), the supreme court noted:

> The ABA newly proposed Lawyer's Code of Professionalism section C states: "I will be a vigorous and zealous advocate while paying heed to concepts of common courtesy and recognizing that excessive zeal can be detrimental to my client's interest and to the proper functioning of our system of justice."

And before the adoption of the current SCR 20, there was a requirement in SCR 20.34(3)(t) (1986), that "[a] lawyer should be courteous to opposing counsel . . . ." *Oostburg State Bank v. United Sav. & Loan Ass'n,* 130 Wis. 2d 4, 12, 386 N.W.2d 53, 57 (1986).

Counsel for Miro cannot be faulted for complying with the technical requirements of the Rules of Civil Procedure. However, his failure to go the extra step, to alert counsel for Midland that a lawsuit was forthcoming and a default judgment would be requested, overlooks the very purposes for which courts were created—that is, to try cases on their merits and render judgments in accordance with the substantial rights of the parties. Rather than extending respect and courtesy to opposing counsel and having the dispute resolved on a level playing field, Miro's counsel chose to do nothing more than meet the minimum requirements of the law.

Although Wisconsin has no reported cases on the legal or ethical obligations of counsel to put opposing counsel on notice that a lawsuit or default judgment is close at hand, California, among several jurisdictions, has addressed the issue. California requires that if the plaintiff's counsel knows the identity of the lawyer representing the defendant, he or she owes an **ethical obligation** to warn before requesting entry of the defendant's default. Failure to do so is considered a professional discourtesy to opposing counsel that will not be condoned by the courts. "[E]ven legitimate tactics must sometimes yield to the only goal that justifies the very existence of our judicial system; i.e., the resolution of our citizens' disputes and the administration of justice." *Brown v. Presley of S. Cal.*, 261 Cal. Rptr. 779, 784 n.3 (Cal. Ct. App. 1989). "While as a matter of professional courtesy counsel should have given notice of the impending default, and we decry this lack of professional courtesy, counsel was under no legal obligation to do so." *Bellm v. Bellia*, 198 Cal. Rptr. 389, 390 (Cal. Ct. App. 1984) (citation omitted). "The quiet speed of plaintiffs' attorney in

seeking a default judgment without the knowledge of defendants' counsel is not to be commended." *Smith v. Los Angeles Bookbinders Union No. 63*, 284 P.2d 194, 201 (Cal. Ct. App. 1955).

Admittedly, the failure to treat opposing counsel with courtesy is not the equivalent of referring to opposing counsel as an "asshole" and remarking that he could "gag a maggot off a meat wagon," *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 54 (Del. 1994), or calling the opposing party a "son of a bitch," threatening to kill him and finally, running his car off the road with a front-end loader, *Disciplinary Proceedings Against Beaver*, 181 Wis. 2d 12, 17-18, 19, 510 N.W.2d 129, 131 (1994), but it is still symptomatic of the decline of civility in the legal profession.

Many lawyers, judges and academicians have contemplated this decline. Mark Neal Aaronson, a professor of law at Hastings School of Law, theorizes that "the inability of lawyers to conduct themselves in a reasonable fashion has less to do with a lack of good manners or ignorance about what conduct is expected, but has more to do with not having the strength of character needed to exercise self-discipline when making practical or ethical choices." Mark Neal Aaronson, *Be Just to One Another: Preliminary Thoughts on Civility, Moral Character, and Professionalism*, 8 ST. THOMAS L. REV. 113, 116 (1995). Professor Aaronson's preliminary comments on civility and the basic virtues provide some clues to the general demise of civility:

> Civility as a concept has a rich and deep etymology that embraces much more than today's common usage of the term—as little more than a synonym

for courtesy or politeness. It originates in classical political and moral philosophy, and generally refers to the kinds of virtues associated with good citizenship.

. . . .

These distinctive virtues, which harken back to the ancient polis, are the cardinal civic virtues: practical wisdom, temperance, courage, and justice. They represent a set of interdependent ideas about the relationship of moral character to human self-fulfillment, and they comprise a good part of the idea of civility in its classical sense. Together they establish a moral decision-procedure for making important choices about both means and ends in carrying out various societal roles. To act wisely and justly, with moderation and courage as appropriate, requires considerable self-awareness and self-restraint.

Because, for too long, the cardinal virtues have been either taken for granted or overlooked as presuppositions for the practice of law, they have not been sufficiently nurtured as part of a lawyer's education and, consequently, have been too often neglected or forgotten in actual practice. Their absence as a conscious or habitual part of how individuals practice law partially explains what others perceive as a fairly pervasive breakdown in contemporary legal professionalism.

*Id.* at 116-18 (footnotes omitted).

On a more practical level, Judge Penny J. White of the Tennessee Court of Criminal Appeals discusses common courtesy in her list of *10 Things They Never Taught You in Law School*:

#2: Becoming a lawyer does not require that you lose your humanity. Even though you have reached

662

that elevated and lofty place—lawyerhood—don't leave your civility and common decency behind. Act like a human. If you have forgotten how, fake it. Treat other lawyers, witnesses, clients, judges, jurors and clerks with respect and dignity.

. . . .

Many lawyers seem to fall into a modified golden rule posture. Do unto others what they have done unto you or even better, before they get a chance to do unto you. Don't do it. Treat your clients and all professional associates with respect. . . . Don't harangue or harass victims, adverse witnesses, or opponents. Don't seek out confrontation rather than cooperation.

. . . .

Common sense and common courtesy, right and wrong, and justice still matter. Make them your trademark.

Penny J. White, *10 Things They Never Taught You in Law School*, 30-JUN Tenn. B. J. 20, 21 (1994).

The result of this appeal is dictated by the analysis included in the lead opinion; it is lamentable that under the prevailing law we cannot grant relief to Midland. Default judgments are not favored because the justice system is designed to provide a level playing field for the resolution of disputes on their merits. The failure of counsel to be forthright, to deal with opposing counsel with respect and to extend common courtesy is regrettable and illustrates the legal profession's neglect of the cardinal virtues of wisdom, temperance, courage and justice.