**Rhetta MUSTER \*, Petitioner,**

v.

**Chester MUSTER, Respondent.**

**No. CS99–04606.**

Family Court of Delaware.

Submitted: Feb. 2, 2004.
Decided: Sept. 6, 2005.

---

56. *Id.*

57. *Id.*

\* Pseudonyms are used to protect the privacy of the parties.

Thomas E. Gay of Stumpf, Vickers & Sandy, P.A., Georgetown, DE, for petitioner.

Bruce A. Rogers, P.A., Georgetown, DE, for respondent.

## OPINION

HENRIKSEN, J.

This is the Court's decision on the remaining matter ancillary to the divorce of Rhetta Muster ("Wife") and Chester Muster ("Husband") which involves the Court's decision on whether to award attorney's fees, and if so, in what amount.

In the Court's decision of February 2, 2004, the Court previously set forth the law which it finds applicable in awarding attorney's fees in marital property cases.[1] In that decision, the Court spelled out specific incidents where the Court believed that Wife demonstrated a level of bad faith in her negotiations and actions. Those areas of bad faith involved: 1) Wife's failure to follow through with an Interim Stipulation and Order of the Court, dated March 20, 2002, involving the party's former marital home; 2) Wife's failure to follow through with providing discovery which was ordered by the Court in a Pre-trial Order of March 23, 2001; 3) the Court's concern with the significant omissions and possible misrepresentations contained in Wife's various pleadings; 4) Wife's failure to provide justified reasons for not cooperating in the execution of joint tax returns; and 5) Wife's misrepre-

sentations involving the rental payments concerning ten acres of farm land. Of these particular items, the Court finds that Mr. Gay's hourly fee of $200.00 per hour was reasonable and appropriate. The Court also accepts the time representations made by Mr. Gay in his affidavit on these issues. Although Mr. Gay indicated in his summary that he spent three (3) hours of time on the income tax issue, his affidavit only listed two (2) hours of time. Having combined all of the fees incurred by Husband for Mr. Gay's time reported on these particular incidents, including two (2) hours on the tax issue, the Court finds it appropriate that Wife should pay to Husband, at a minimum, attorney's fees of $2,590.00.

The Court was concerned that the combination of all of these particular incidents of bad faith committed over time by Wife and/or her attorney may have destroyed any hope whatsoever of the partys' ability to negotiate in good faith a possible settlement. Therefore, the Court, in its property division order, invited Husband's attorney to itemize all time spent on Husband's behalf from the date of the first of these aforementioned infractions to the date of trial. The first of these infractions began as a result of Wife's failure to provide certain discovery following the Court's Pre-trial Scheduling Order of March 23, 2001. This was followed by the problems surrounding Husband's buyout of Wife's interest in the marital home, which occurred in late March 2002, and was then followed by the misrepresentations made around December 2002 concerning the ten acres of land ownership.

Only because the Court had direct involvement in either deciding motions prior

---

1. *R.M. v. C.M.*, not reported in A.2d, 2004 WL 1146678 (Del.Fam.Ct.2004); Reargument granted in part and denied in part in *R.M. v. C.M.*, 857 A.2d 1037 (Del.Fam.Ct.2004); Motion to Reopen denied in *R.M. v. CM.*, not reported in A.2d, 2004 WL 3245802 (Del. Fam.Ct.2004).

to trial or hearing testimony at trial about the previously noted specific problems was the Court in a position to make a determination on the facts surrounding those specific issues. Generally, however, a Court decides the issue of attorney's fees following the property division decision where it learns of additional information, especially settlement negotiations between attorneys, that would not be permissible for the Court to hear prior to making its decision on the property division.

Having reviewed the affidavits and supporting documents presented by both parties at this juncture, the Court remains convinced that it should not alter the Court's previous findings of bad faith by Wife in the previously described events.

The Court would be remiss if it did not state that the Court recognizes and is aware of Wife's position that all or part of her bad faith conduct was attributable to the conduct of her then attorney, Mr. Rogers. Any language which the Court uses in this opinion whenever it describes any bad faith conduct by Wife does not decide nor rule out the possibility for Wife's attorney being attributed with all or part of the fault leading to the findings against Wife.

These specifically noted incidents constituted either disregard for Orders of the Court or the making of clearly misleading and incorrect factual representations. However, the recent information provided to the Court following the property division decision relates to what additional fees the Court might consider assessing against either of the parties for the manner in which they handled their various negotiations, and, more particularly, whether those negotiations were pursued in bad faith.

There was no question in this Court's mind that the particular incidents already noted regarding Wife's bad faith not only merited attorney's fees for the time taken by Husband's attorney to deal specifically with those matters, but also may have infected to such a degree the negotiation potential for this case that there could be no hope of settlement. For this reason, the Court specifically invited Husband's attorney, Mr. Gay to seek additional fees. He has submitted a request totaling $27,600.00 for 138 hours of work at $200.00 per hour he performed going back to September 18, 2000. And, although Mr. Gay in his argument added an additional 10 hours to prepare his affidavit, his time-sheets, as pointed out by Wife's present attorney, Mr. Bounds, have included only 4.9 hours for the preparation of the affidavit. Since Wife's previously noted incidents of bad faith caused the Court to direct Mr. Gay to prepare his affidavit for services to time of trial, the Court will allow an additional $980.00 in fees for Mr. Gay's 4.9 hours at $200.00 per hour to prepare the affidavit.

## CIVILITY

Wife's current attorney, Mr. Bounds, makes certain compelling arguments to suggest that Wife should not have to pay any additional fees. Most compelling, and most unfortunately, Mr. Bounds' avers that "the prime cause of both Husband's and Wife's attorney's fees and costs in this case is the acrimonious conduct exhibited by and between Messer's Gay and Rogers during the course of their four year battle over this case." Having now had the opportunity to review much of the correspondence between these two attorneys, which was contained in both Mr. Gay's Motion for Fees and highlighted in Mr. Bound's response, the Court must agree. The Court is extremely concerned with the lack of civility each of these two experienced and capable attorneys have demonstrated towards each other in their correspondence, and how this acrimonious conduct

quite probably further fueled their clients' already existing venom for each other.

The Court is unable to determine which attorney first crossed the line from zealous representation, which is time-honored, to incivility. The Court does not believe that line was crossed, nor was there any demonstration of bad faith, when Mr. Rogers sent his first, and last offer letter on behalf of Wife, dated January 12, 2001. Though clearly off the mark from the Court's final decision, the offer was politely made. The Court also fully understands that the offer was made where no party at the time had the benefit of an expert valuation of the husband's logging business. When Mr. Gay responded on January 23, 2001 to Mr. Rogers offer, the Court is also of the belief that Mr. Gay did not have the benefit at that time of an expert's appraisal of the business. Since he represented the husband, who was most likely the more knowledgeable of the two parties about the possible value of Husband's interest in the business, perhaps the more appropriate response would have been to return correspondence stating that we believe your client's offer is extremely high. Instead Mr. Gay described the offer as "outrageous." Mr. Gay's response also described another part of Wife's offer as "hypocritical". Instead of using the word "hypocritical", perhaps a different tone in the negotiations might have been established if Gay had queried why Wife would seek an interest in one asset held in Husband's name alone, while at the same time Wife wanted Husband to quitclaim to Wife any interest Husband might have in another asset held in Wife's name alone. At this point in the negotiations, however, neither of these attorneys had clearly crossed the line from zealous representation to incivility. Perhaps a better use of words by Mr. Gay at this early stage would have promoted a better air of cooperation between the parties.

This Judge has previously quoted the words of a former respected Judge of the Delaware Family Court, Judge Wakefield, who stated, "it is obvious that taking a reasonable position or refusing to negotiate in good faith results in prolongation of litigation and therefore constitutes excessively litigious conduct ..." [2] Judge Wakefield went on to say.

"The entire fabric of civil litigation is dependent upon the willingness of parties to settle cases at the earliest opportunity before trial and not to assert positions which are unreasonable or against decided case law. Parties and their attorneys must act in good faith in this respect, and, conversely, a party who tenaciously adheres to an unreasonable position or one which is clearly against decided statutory or case law should not be able to avoid the consequences, one of which may be reimbursing the other party for counsel fees after the adverse judgment is entered by the Court".

In this Judge's prior decision in the *A.L.M. v. T.C.M.* case, the Court also acknowledged the good guidance offered by former Family Court Judge James, who stated, "... that the emotional turmoil present in most domestic litigations sometimes compels litigants to take unreasonable adversarial positions." [3] As a caveat to the words of Judge James, this Judge, however, went on to say in the *A.L.M.*

---

2. *A.L.M. v. T.C.M.*, 2001 WL 1773730 (Del. Fam.Ct., 2001), (citing *Hildrick v. Hildrick*, Del.Fam.Ct., File No. CN88–6894, Wakefield, J. (January 02, 1990)).

3. *A.L.M. v. T.C.M.*, 2001 WL 1773730 (Del. Fam.Ct., 2001), (citing *Gesullo v. Gesullo*, Del. Fam.Ct., File No. CN87–0099, James, J. (October 25, 1990), citing *Bristow v. Linn*, Del. Fam.Ct., File No. 1969–85, 1990 WL 91604, James, J. (May 30, 1990)).

case, "This recognition of the reality of the existence of emotional turmoil in domestic cases, does not, however, excuse bad faith conduct, especially where attorneys are involved and expected to guide their clients." This Judge went on to say, "professionalism and civility to your fellow lawyer, as well as your obligation to your client, requires that all attorneys in this day and age continue to work diligently in exploring settlement options with opposing counsel, which requires a full exchange of information without delay. Not only does this approach serve the bar and the bench, but most of all, it saves the client financial strain, and emotional drain. In no area of law is this more important than in the area of domestic relations." [4]

The Court is not aware of any other offer of settlement made in this case other than the one made by Wife through Mr. Rogers on January 12, 2001. It took an inordinate amount of time for the parties to obtain the opinions of their respective expert witnesses on the valuation of the logging business. The Court certainly did not expect more legitimate attempts at offers until the experts were able to advise their respective clients. However, the first day of trial in this matter occurred on August 14, 2002, eighteen months following the first offer. The Court then held trial on three separate dates over the next year, the last date being July 28, 2003. The Court laments the inability of these attorneys to try to make further efforts at settling this case prior to the first day of trial, and at any time thereafter before the last day of trial. However, having now had the opportunity to read the correspondence that was sent between these two attorneys over the course of their representation of these clients, the Court is not surprised that there were no further efforts attempted toward reaching a settlement.

Beginning in early April 2001, Mr. Gay began writing Mr. Rogers a series of letters attempting to clarify the times each of the parents would have the children during their spring school break. It is likely that the Court did not have the benefit of reviewing all of the correspondence. However, five days after Mr. Gay wrote his first letter on April 6, 2001, he set forth in his letter of April 11, 2001, a statement that trying to come to an agreement on visitation with Mother was like "taking candy from a baby". I think Mr. Gay meant that working out the agreement with Mother was difficult, although the Court has generally heard that phrase to suggest it is easy to "take candy from a baby". Although Mr. Gay perhaps should have not resorted to those terms, he was trying very hard to nail down for his client specific times when his client would be able to visit with the children during the Easter break. Furthermore, he was trying to avoid filing an emergency motion with the Court. Rather than provide the clarity which Mr. Gay was seeking, Mr. Rogers responded in a letter dated April 12, 2001, with language which the Court found unclear as to the terms of visitation. Perhaps Mr. Rogers' response appeared vague to the Court because the Court had not been privy to all the correspondence. Mr. Rogers then told Mr. Gay, "rather than resort to name-calling and mixed metaphors, let's just address visitation concerns so these boys may have an enjoyable vacation." Mr. Rogers then told Mr. Gay to provide him with a copy of any emergency motion that Mr. Gay decided to file.

Rogers wrote a second letter to Gay on April 12, 2001, which stated "if I have disparaged your client, please forgive me.

---

4. *A.L.M. v. T.C.M.,* 2001 WL 1773730 (Del. Fam.Ct. 2001).

Truth sometimes is difficult." Since the Court is again not privy to what alleged disparaging remark may have been made, the Court is unable to comment on the appropriateness of Rogers' statement. At the same time, however, the Court wonders why Rogers in one sentence asks to be forgiven, but in the immediate following sentence, where he says "truth sometimes is difficult", Rogers seems to withdraw the apology. Rogers then goes on in his letter to close the door on any further discussion as to the visitation schedule for the boys when he says, "no motions, no modification." Rogers then tells Gay that Gay's client is not being honest. Perhaps there is a better way to make such a statement about another attorney's client, but perhaps sometimes it has to be said. What does not have to be said, however, is Rogers' final statement that, "I understand your letter of April 10, 2001, may have been written for client consumption, however, it does little to move this case towards settlement." Such a statement was clearly unnecessary and did nothing to advance the interests of Mr. Rogers' client. The communications were becoming uncivil.

In even yet another letter from Gay faxed to Rogers on April 12, 2001, Gay continued to seek clarity from Rogers on the parties' agreement as to the upcoming Easter vacation. In a letter from Gay to Rogers on April 25, 2001, rather than ignore Rogers' inappropriate remark about writing correspondence for client's consumption, Gay accused Rogers of doing the same. At this point, both attorneys' efforts to represent the best interest of their clients were being clouded by the injury they felt from each other's insults. Two wrongs had not made a right.

At least from the letters that the Court has reviewed, things appeared to have quieted down until August 2001. On August 8, 2001, Rogers wrote Gay to address points of Gay's "last half-dozen letters on this matter." The parties were still working out visitation, but it now involved visitation during the summer. Rogers then noted that the logging business expert for Gay was a half-year behind schedule in delivering the information needed to value the logging business. The Court is sure that this was a sore point for all, and probably out of Gay's control. Rogers noted that there would be no further negotiation on the remaining ancillary matters until the expert's appraisal was received. This was likely appropriate.

Gay's letter of August 24, 2001, noted that Husband's expert appraiser of the business finally supplied his valuation on August 13, 2001. The first day of trial occurred one year later on August 14, 2002. While the Court realizes that Wife's expert witness would need some time to review the information from Husband's expert, and while the Court also realizes that there needed to be certain clarifications in Husband's expert's information, the Court again notes its lament that no further offers of settlement were forthcoming. Of course, Gay's letter of August 24, 2001, also gave response to Roger's comment about Gay's "last half-dozen letters" suggesting that Rogers and/or his client needed to make a more careful review of their previous correspondence in order that Gay would not have to continually correct and clarify previous discussions.

In this Judge's entire 24 years of practicing law, he never used the word "acerbic" in describing letters he had received from his colleagues of the bar. He never received a letter from any of his colleagues of the bar containing the word "acerbic". This Judge first saw the word "acerbic" in Rogers' letter to Gay dated December 04, 2001, wherein Rogers stated, "perhaps if [Husband] would attempt to communicate

with my client directly, rather than through *acerbic* attorney's letters, he might understand what is in the best interest of his children." (Emphasis added). Although I am sure most who read this opinion will know the meaning of the word "acerbic", this Judge had to look it up. It is defined in Merriam Webster's Deluxe Dictionary, 10th Collegiate Addition, as "acid in temper, mood, or tone." Learning that this word would not have a good connotation if used to describe the writings from your colleagues of the bar, I understand why I had never used the word in commenting on the language contained in letters of my respected adversaries, nor had I ever seen the word in a letter from any of them describing my letters. The word "acerbic" is not a nice word.

Probably the most outrageous incident of reported incivility around the country that this Judge could find is found in the Delaware Supreme Court case of *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 54 (Del.1994). One non-Delaware attorney appearing *pro hac vice* in Delaware called the Delaware attorney during a deposition an "asshole", and also remarked that apposing counsel could "gag a maggot off a meat wagon". In the addendum to its decision, the Delaware Supreme Court found the use of such speech to constitute a "serious issue of professionalism".[5] The Supreme Court went on to cite the Statement of Principles of the Delaware State Bar Association, for the guidance of Delaware lawyers adopted in November 1991, noting that the purpose of the Statement of Principles was to "promote and foster the ideals of professional courtesy, conduct and cooperation." The

Supreme Court went on to say, "a lawyer should develop and maintain the qualities of integrity, compassion, learning, *civility*, diligence and public service that mark the most admired members of our profession ..." (Emphasis added).[6] Footnote 29 of the opinion also cited further language from The Statement of Principles, wherein the Supreme Court quoted, "(A) lawyer ... should treat all persons including adverse lawyers and parties fairly and equitably.... Professional civility is conduct that shows respect not only for the Courts and colleagues, but also for all people encountered in practice .... respect for the Court requires ... emotional self-control; [and] the absence of scorn and superiority in words or demeanor...." In the addendum, the Supreme Court stated, "staunch advocacy on behalf of a client is proper and fully consistent with the finest effectuation of skill and professionalism. Indeed, it is a mark of professionalism not weakness, for a lawyer to zealously and firmly protect and pursue a client's legitimate interest by a professional, courteous, and civil attitude towards all persons involved in the litigation process. A lawyer who engages in the type of behavior exemplified by [the attorney who made the ill-mannered statements in the deposition] is not properly representing his client, and the client's cause is not advanced by the lawyer who engages in unprofessional conduct of this nature."[7] The Supreme Court described the attorney's ill-mannered use of words as "unprofessional behavior [which was] outrageous and unacceptable."

The Court notes that language used by the attorneys in the present case certainly

5. *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 52 (Del.1994).

6. *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 53, footnote 29. (Del.1994).

7. *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 54 (Del.1994).

never raised to the ghastly level of the language used by the non-Delaware attorney in the *Paramount* case. Furthermore, any particularly unflattering use of words used in the present case was not made on the record during a deposition as were the very vulgar comments evidenced in the *Paramount* case. The more subtle negatives used by each of the attorneys in the present case, which neither probably expected would eventually come the attention of the Court, was contained in correspondence which only came to the Court's attention by reason of the request for attorney's fees. The cases are also dissimilar in that, although having to look up the word "acerbic", I think most anyone would have immediately known the meaning of the words used by the offending attorney in the *Paramount Communications* case.

From a review of the letters presented to the Court, it appeared that Gay was able to refrain from responding to Rogers' characterization of his letters as "acerbic". Perhaps, Gay, like this Judge, did not know what the word meant; and perhaps properly realizing that the statement was not relevant to the real needs of his client's case, Gay did not take the time to look up the word.

Mr. Gay's letter to Rogers of December 12, 2001, noted that Rogers apparently held on to a stipulation for a month before returning it to Gay. That delay was most unfortunate. Also unfortunate was that Gay then saw the need to criticize Roger's office in not making what Gay described as a "de minimis" amendment that would have saved time for all parties. Gay then went on to criticize Rogers and his client for perhaps "not [having] any better use for her hard earned money or you for your time ..."

Gay also sent another letter to Rogers on December 12, 2001. In that letter, he described Rogers' client's actions related to the father's contacts, or lack of them, with the children, to be "manipulative and controlling." Without knowing more, perhaps Gay's statement was accurate, and if so, appropriately made. Gay went on to question Rogers' client's emotional state, suggesting that if she "were more secure, she would not feel the need to negotiate with [father] by and through the children...." Again, the Court cannot say whether this statement was or was not appropriate without knowing more.

Rogers then wrote a letter to Gay dated December 24, 2001. He first seemed to apologize for his actions which required Gay's office to make a "de minimis" change on a one page stipulation rather than having made the changes himself. However, Roger's apology was not made that simply. This Judge can feel the tongue in Roger's cheek when he stated, "perhaps I should have simply re-drafted the document to more accurately reflect the agreement of the parties [rather than mark up the one you sent over *which did not]*." (Emphasis added). Rogers went on to say, "I apologize for any inconvenience the retyping *of a single page stipulation* may have caused your office." (Emphasis added). Rogers then stated that Gay's reference to Mother's unstable emotional state served no purpose in the litigation. Again, the Court does not have enough information about what was going on outside of the case about Mother's emotional state to determine whether Mr. Gay's comment was appropriate or extremely careless and unwarranted. Rogers went on to anticipate Gay's future tactics when he stated, "I am sure there will be an attempt made to introduce this letter [about Mother's emotional state] to the Court in some fashion." Rogers' letter of December 24, 2001, also contains the alarming realization that both attorneys had agreed, at least according to Rogers, that the case "will not settle",

even though they now had received at least one expert's valuation of the business, and there were still several months before the first day of trial. Rogers went on to suggest that the attorneys should not insult the other's client, but rather that both of them "should simply stick to the facts and let the Court decide."

Gay then responded in a letter of January 9, 2002. Rogers, although indicating that he had enclosed the signed stipulation with his letter of December 24, 2001, had apparently failed to do so. Rather than simply point that out to Rogers, or perhaps even just place a simple phone call to his office-the Court wonders whether these two attorneys ever talk on the telephone like this Judge did with so many of his colleagues over his 24 years of practice -, Gay added an additional sentence with the seeming intent of clarifying that Rogers' alleged apology was really a true apology. Gay then provided Rogers with a history of his undergraduate education and made reference to his past eight years of practice in domestic relations in order to support his ability to be relatively qualified to render some opinions on individuals/parties involved in pending custody/visitation proceedings. The Court believes that discussion was unnecessary. Gay went on to note that Rogers had set forth a "hypocritical position". Instead of sticking to the facts between these two litigants, Gay then unnecessarily brought in some of the history between these two attorneys in other cases when he stated "while I continue to hear the recurring theme in many of our cases, that I am "playing into my client's position", in the respective litigation, to the contrary, I find it interesting that many of your clients maintain similar degrees of unreasonableness and intransigence and the degree of manipulation and control over the children at issue in many of our cases is troubling in its degree of coincidence." Gay's letter to Rogers of January 9, 2002, continued to make reference to their litigation in other cases when he stated "lastly, perhaps you should review some of your recent motions in several of our other cases, as you express the concern that I may attempt to introduce your correspondence to the Court. Contrary to your presumption and accusation, you have shown a proclivity and propensity towards attaching correspondence to interim motions in many of our recent cases and it would seem that your hypocrisy (as set forth above) goes unabated." Gay concluded his letter by saying "in the event that you wish to maintain only procedural or purely legal positions within your correspondence, I will welcome this type of change from your office as it surely would cut down on the length of our respective correspondence."

As already noted earlier in this opinion, around January of 2002, Wife failed to abide by a Stipulation and Order of the Court by failing to timely remove herself from the former marital home. Naturally, letters started to flow between the two attorneys in mid-January 2002. Gay's letter to Rogers of January 23, 2002, stated that an earlier letter response from Rogers was a "continuation of your client's dilatory tactics instead of a simple and concise response to a reasonable query." Gay noted that, "it is unfortunate that your client seems to choose a more litigious course of conduct than is necessary." Since this Judge was privy, through motions filed, with this particular situation, this Judge is in a position to agree with both of Mr. Gay's statements.

Gay's letter to Rogers dated April 10, 2002, suggested that Rogers apparently spent the time sending a letter to Gay dated April 8, 2002, pointing out that one of Gay's recent letters contained the wrong "In Re" caption. Gay's letter of April 10, 2002, apologized for having used the wrong

"In Re" caption. Gay added his request for Rogers in the future to promptly review, execute and file with the Court stipulations. Gay's letter evidences a recurring concern by him that Rogers was dilatory in his responses to Gay. The Court's property division decision in this case, in which it denied Wife's claim to alimony for failing to provide necessary information despite repeated reminders and opportunities to Rogers to provide the information, suggests that Gay's characterization was likely accurate. The Court does not know, however, whether the failure to provide the information was the fault of Rogers or the wife.

On May 14, 2002, Gay wrote two letters to Rogers, one brief, and one more lengthy, regarding Rogers' client's failure to relocate out of the family residence, as had been required by their Stipulation and Order of the Court. Both letters came back stamped by Rogers "no response warranted". Perhaps at this juncture, Mr. Rogers was not in a position to respond on behalf of his client. The Court is not privy to the communications that went on between Rogers and his then client. The Court wonders whether a simple telephone call from Rogers to Gay indicating that he was not in a position to respond, and that Gay should therefore take whatever action he needs to, would not have been a more civil and appropriate approach.

More than a month later, Gay responded to a letter from Rogers indicating that "instead of sending it back to you with an indication "no response required", 1 will provide you with a more professional response." In another letter from Gay to Rogers on June 17, 2002, Gay criticized Rogers when he stated, "perhaps if you would take less time critiquing my office practices you would have more time available for appropriate responses to reasonable requests or observations delivered in letter/facsimile format." Gay also, tongue and cheek, suggested his hope that Rogers' office staff would be able to make Rogers aware of an upcoming 2-way discovery conference.

In a letter to Rogers dated August 12, 2002, Gay wrote, "it is unfortunate that you choose to jog around Georgetown on your daily break, instead of going over discovery issues that require attention in the above captioned pending cases." I trust and hope that Mr. Gay does not have similar feelings for the at least three Judges in Sussex County who I know jog at lunchtime on a daily basis. In the letter, Gay went on to laud himself, when he stated, "you are well aware of my reputation for working long hours, into the evening." He went on to state that if Mr. Rogers was "not running around Georgetown, then you are free to stop by my office any time after 5:00 p.m. to discuss discovery issues . . ."

In a letter from Rogers to Gay dated September 04, 2003, Rogers noted that Gay's office was sending letters to Rogers at his former mailing address, and asked that they use his present address. Gay clearly crossed the line of relevance to the litigant's case when he responded with a letter on September 24, 2003, wherein he spent an entire paragraph noting that he has multiple secretaries performing multiple tasks. He clearly understood Rogers' earlier comment regarding his address change to be a form of criticism when Gay responded, "my firm relocated some years ago, and I faced the same difficulties, yet not once did I feel the need to chastise opposing counsel as a result of this type of inadvertent mistake."

Having reviewed closely all of this correspondence, the Court is appalled with the depth of incivility reached between these two attorneys, and the possible adverse effects such incivility had on the ability of

each of them to adequately represent their clients towards a less emotional, and less expensive resolution of their marital disputes.

In general, the Court finds no fault with Gay for his persistence in communicating to Rogers when not getting prompt and definitive responses. The Court does fault Gay, however, for lowering himself into the fray of incivility. Because of Gay's improper actions, the Court believes Gay's actions attributed in sizeable part to diminish the possibilities of negotiation and settlement, and, as such, added unnecessarily to the amount of fees charged by Mr. Gay of his client.

As to Rogers, the Court faults him not only for his lack of civility, but also for not quickly responding to Gay's requests, as well as being evasive and incomplete in his responses. Again, these delayed, evasive and incomplete responses from Rogers may have been the fault of Rogers' client. Rogers and his former client may have to determine between themselves where that fault lies.

On November 01, 2003, the Delaware State Bar Association and the Delaware Supreme Court jointly adopted the Principles of Professionalism for Delaware Lawyers for the guidance of Delaware lawyers (hereinafter "Principles"). The Principles of 2003, replaced and superseded the Statement of Principles of Lawyer Conduct earlier adopted by the Delaware State Bar Association on November 15, 1991. Reference to the 1991 adopted principles has already been made in this opinion when the Court previously discussed the addendum the Supreme Court added to its decision of *Paramount Communications, Inc. v. QVC Network, Inc.,* in which one attorney called another attorney certain very unflattering names during a de-

position.[8] The purpose of the 2003 Principles "is to promote and foster the ideas of professional courtesy, conduct and cooperation. These Principles are fundamental to the functioning of our system of justice and public confidence in that system." The Principles stress the time-honored requirement that a lawyer represent his client zealously. At the same time, however, the Principles point out that zealous representation does not justify a lack of promptness in responding to communications or the making of intemperate, abusive, rude, or disrespectful personal attacks towards others. The Principles of 2003 stress that such incivility "may be detrimental to a client's interest and contrary to the administration of justice." The 2003 Principles also stress that "in dealing with opposing counsel, ... a lawyer should strive to make our system of justice work fairly and efficiently. A lawyer should avoid contact that undermines the judicial system or the public's confidence in it, as a truth seeking process for resolving disputes in a rational, amicable and efficient way." There was nothing even remotely amicable in the present case. Although the Principles of 2003 clearly state that they shall not be used as a basis for lawyer discipline or sanctions, the realization set forth in the Principles that professional incivility between lawyers in specific cases "may be detrimental to a client's interest and contrary to the administration of justice", suggests that a lawyer's incivility has the potential for rising to such a level as to constitute a violation of Delaware Professional Contract Rule 3.2. Rule 3.2 requires a lawyer to expedite litigation consistent with a client's interest. Incivility may also rise to a level which is contrary to the lawyer's responsibilities as set forth in the preamble of the Delaware Rules of Professional Conduct. The

8. *Paramount Communications, Inc. v. QVC*     *Network, Inc.* 637 A.2d 34 (Del.1994).

preamble, in subsection 5, states, in part, that "a lawyer should demonstrate respect for the legal system and for those who serve it, including Judges, other lawyers and public officials." In subsection 9 of the preamble, it says, in part, "these principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests within the bounds of the law, while maintaining a professional, courteous and civil attitude towards all persons involved in the legal system."

The preamble to the Code of Pretrial Conduct of the American College of Trial Lawyers, approved in October 2002, contains this same theme of encouraging zealous representation, while at the same time requiring the use of civility and courtesy towards others. The preamble states, "while trial lawyers owe undivided allegiance to their clients, they also owe important duties to the judicial system, their colleagues, and to the public. Only by fulfilling these duties can trial lawyers help to insure the proper administration of justice." In section 4 of the American College of Trial Lawyers Code of Pretrial Conduct, entitled Communication with Adversaries, it is specifically stated in subsection (a) that, "in their practice, lawyers should remember that their role is to zealously advance the legitimate interest of their clients, while maintaining appropriate standards of civility and decorum. In dealing with others, counsel should not reflect any ill feelings that the clients may have towards their adversaries. Lawyers should treat all other lawyers, all parties, and all witnesses, courteously, not only in Court, but also in other written and oral communication. . . ." Subsection (b) of section 4 states, "lawyers should avoid hostile, demeaning, or humiliating words in written and oral communication with adversaries." The "Scheduling" section of the Code of Pretrial Conduct reminds lawyers to be prompt in their dealings with other lawyers and to be reasonable in both requesting time extensions and in agreeing to those requests rather than wasting the time of the client and the Court in arguing over these often trivial matters.

The subject of civility was the main theme of the July/August 2005 addition of The Bencher, the magazine of the American Inns of Court. In her president's message to that addition, the Honorable Deanell R. Tacha wrote of the legal profession, "we are the profession whose core duty is to resolve disputes in an orderly, civilized, fair, and professional manner. To the extent that we fail, we diminish ordered liberty and undermine the rule of law . . . .it falls to us then to treat the problem [the loss of civility in the larger society] with a very heavy dose of civil discourse in the most difficult settings— settings where people are often angry, distressed, emotional, and under extreme pressure." Judge Tacha went on to write, "under these difficult circumstances, lawyers and judges make all the difference in the manner in which the controversy is resolved. To the extent the legal professionals involved are able to bring to the situation a clear commitment to thoughtful listening, tolerant mutual respect, and measured, caring advocacy and decision making, they shine a light upon the meaning of ordered liberty for all who are affected by the justice system. We are the keepers of civility in that system. We are the keepers of the rule of law. We must, therefore, be models of civility wherever we are. We have a compelling responsibility to bring the sense of mutual respect and measured discussion to our most difficult societal contexts. That defines civility. That is, in fact, a central responsibility of the legal profession. It has never been needed more."

Lawyers who also contributed articles to The Bencher's July/August 2005 issue re-

minded us that, "written advocacy has become the most common medium for the commission of uncivil acts",[9] the need to emphasize the Golden Rule: "do unto others" and that "you catch more bees with honey",[10] and, finally, the recurrent state of concern of many of our profession that our profession is suffering from a decline in civility.[11]

This Judge is happy to report that the Delaware lawyer, at least the vast majority, continues to uphold the time honored traditions of the Delaware Bar in providing zealous representation to their clients while at the same time demonstrating the utmost of courtesy and civility to all involved in the process. Fortunately, the present case presents the exception rather than the rule of the Delaware lawyer. That time-honored tradition must continue, and instances of discovered incivility should be quashed before they infect the legal profession and our Delaware Bar from within its ranks. Failure to stifle such incivility will also sour the opinion of those looking at the legal profession from the outside, such as the litigants and those with whom they share their experiences. A lack of courtesy and civility on a lawyer's part in civil litigation, especially in domestic matters, erodes and destroys the ability of the litigants, already strained in their relations, to carry on settlement negotiations in an ordered and respectful manner, thus harming the appropriate resolution powers of the judicial system and also society's perspective of that system. This cannot be tolerated.

In a concurring opinion in a 1996 decision out of the Court of Appeals of Wisconsin, presiding Judge Anderson wrote, "I write separately to lament the untimely demise of common courtesy in the legal profession. The factual background of this case is but one example of the hostile environment that is the leading cause of the collapse of common courtesy."[12] Judge Anderson stated, "that there should not be a need to have a rule that counsel should treat each other with respect and courtesy." Judge Anderson made reference to the Delaware decision in *Paramount Communications, Inc.*, previously noted, as an example of the worst kind of incivility in the legal profession. The Wisconsin case involved a far less obvious symptom of the decline of civility in the legal profession, where one attorney did not extend the common courtesy to another of calling the other attorney before filing a motion for default. Judge Anderson suggested that the decline in civility may have occurred "because, for too long, the cardinal virtues have been either taken for granted or overlooked as presuppositions for the practice of law, they have not been sufficiently nurtured as a part of a lawyer's education and, consequently, have been too often neglected or forgotten in actual practice. Their absence as a conscience or habitual part of how individuals practice law partially explains what others perceive as a fairly pervasive breakdown in contemporary legal professionalism." In making these comments, Judge Anderson was quoting the comments of Professor Mark Neal Aaronson written in *Be Just To One Another: Preliminary Thoughts on Civility*,

9. *Civility in Written Advocacy* by Michael Cavendish, The Bencher, July/August 2005.

10. *Civility* by David J. Brown, The Bencher, July/August 2005.

11. John J. Jurcyk, Jr., The Bencher, July/August 2005.

12. *Miro Tool & Mfg., Inc., v. Midland Machinery, Inc.*, 205 Wis.2d 650, 556 N.W.2d 437 (Ct.App.1996).

*Moral Character, and Professionalism.*[13]

Presiding Judge Anderson of the Wisconsin Court of Appeals also quoted Judge Penny J. White of the Tennessee Court of Criminal Appeals who wrote an article entitled *10 Things They Never Taught You in Law School.*[14] The portion that Judge Anderson quoted from Judge White's list of ten things bears repeating:

> # 2: Becoming a lawyer does not require that you lose your humanity. Even though you have reached that elevated and lofty place—lawyerhood—don't leave your civility and common decency behind. Act like a human. If you have forgotten how, fake it. Treat other lawyers, witnesses, clients, judges, jurors and clerks with respect and dignity.
>
> . . . .
>
> Many lawyers seem to fall into a modified golden rule posture. Do unto others what they have done unto you or even better, before they get a chance to do unto you. Don't do it. Treat your clients and all professional associates with respect. . . . Don't harangue or harass victims, adverse witnesses, or opponents. Don't seek out confrontation rather than cooperation.
>
> . . . .
>
> Common sense and common courtesy, right and wrong, and justice still matter. Make them your trademark.

The Supreme Court of Virginia, in the recent case of *Barrett v. Virginia State Bar,* affirmed part of the Virginia State Bars Disciplinary Board decision, which imposed a three-year suspension from the practice of law on Mr. Barrett.[15] The Virginia Supreme Court reviewed the actions of Mr. Barrett, a Virginia attorney, during his separation and divorce from his wife. The Virginia Supreme Court held that Barrett violated Virginia Disciplinary Rules when he wrote a letter to his wife's attorney which the Supreme Court felt was meant entirely to harass rather than deal with the issues of the case. Mr. Barrett, in writing his wife's attorney who had changed her name as part of her own divorce, wrote that Wife's attorney's choice to do so was inappropriate under Christian beliefs. In his letter to Wife's attorney, Mr. Barrett stated, "please pass on to your client the fact that it has not escaped my notice the irony that my wife, who just weeks ago was feigning contempt for the feminism of her friends, has retained one the worst examples of "Christian" feminism ever to pollute the campus of Regent University. You two will make a lovely pair." Mr. Barrett went on to say in his letter to his wife's attorney, "you are inept . . . I beg you to start zealously representing your client's competence and stop wasting her money and my time."

The Virginia Supreme Court found that Barrett's conduct violated their Rule 3.4(j) which provided that a lawyer "may not assert a position, conduct a defense, delay a trial, or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another." Comment 6 to Virginia's Rule 3.4 states, "the duty of a lawyer to represent a client with zeal does not militate against his concurrent obligation to treat, with consideration, all person involved in the legal process and to avoid the infliction of needless harm. . . ."

The Virginia Supreme Court in *Barrett* then stated that they agreed with the Su-

13.   8 ST. THOMAS L.REV. 113, 116 (1995).

14.   30–JUN TENN.B.J.20, 21 (1994).

15.   *Barrett v. Virginia State Bar,* 269 Va. 583, 611 S.E.2d 375 (2005).

preme Court of Kansas, where it was said that:

> "attorneys are required to act with common courtesy and civility at all times in their dealings with those concerned with the legal process.... An attorney who exhibits the lack of civility, good manners and common courtesy ... tarnishes the entire image of what the bar stands for." [16]

The purpose of this decision is not to determine whether disciplinary action should be taken against Wife's attorney or Husband's attorney. The Court's function at this point in time is to consider whether attorney's fees should be awarded against one side or the other. The Court has little doubt that the incivility of both attorneys in this case unnecessarily increased the acrimony between their clients, prolonged the litigation, prevented settlement possibilities, and increased each client's legal fees.

Both attorneys are to be almost equally faulted in their participation in the continued negative and insulting correspondence between them. Their mutual incivilities toward each other no doubt increased the fees of each of their clients. However, Wife and/or her counsel added even more fuel to the fire by the failure to provide timely responses, as well as by providing evasive and incorrect responses. As such, and for the latter reasons, requiring Wife to pay a certain amount of Husband's fees is appropriate.

## OTHER ARGUMENTS

Mr. Bounds also argued on Wife's behalf that the sanctions already imposed against Wife provided sufficient penalty to Wife and sufficient reward to Husband. Thus, for Wife's lack of providing information to the Court, or the lack of her attorney to

provide the information in the event she provided it to him, Wife lost the possibility of receiving alimony for a period up to one-half the length of their marriage. Wife's failure to provide information as to personal property resulted in the further sanction of losing her potential interest in various personal property.

It is difficult, if not impossible, for the Court to determine how much of the aforementioned specific violations by Wife contributed to the overall failure of these parties to undergo reasonable negotiations when factoring in the obvious acrimony between the attorneys for both parties. However, in awarding attorney's fees, the Court has taken into account the penalty to Wife, and the benefits to Husband, caused by the Court's previous sanctions.

## CONCLUSION

While the Court does not want to chill the ability of good Delaware attorneys to competently and zealously represent their client, the Court expects Delaware attorneys to act civilly towards each other and also towards the litigants. This is especially critical in domestic relations cases where the parties' emotions are already fueled, and one of the major benefits of counsel is to be able to interject cooler minds that hopefully will allow the litigants to reach a quicker, less expensive, and more amicable resolution of the legal matters surrounding their marital breakup.

These two attorneys diminished on a regular basis over the past few years the possibility for their clients to adopt an attitude of respectful resolution of the difficult problems between themselves. Had it not been for the unusual nature of the present motion before the Court, involving the Court's determination of what attorney's fees should be awarded, the Court likely would not have reviewed the day-to-

---

**16.** *In re Gershater,* 270 Kan. 620, 17 P.3d 929, 935–36 (2001).

day letters that transpired between counsel. Having seen these letters, however, the Court hopes that these incivilities only occurred between these attorneys in this particular action. Hopefully, these incivilities have not been present in other cases between these two attorneys. Even more, hopefully these incivilities have not spilled out from these attorneys towards other attorneys. And if such acts of nonprofessionalism have occurred, hopefully the recipient attorney of any of these remarks have had the courage, strength, and self-assuredness to avoid retaliation. As can be seen, the retaliation between these attorneys to their respective degrading remarks have done nothing to foster the cause of their respective clients. It is not the purpose of the Delaware lawyer to protect their own ego. The Delaware lawyer's purpose is to zealously and competently represent their client.

At this juncture, before concluding, this Judge believes it important enough to recall the words he heard from a respected member of the Delaware Bar as this Judge sat in a room with other newly admitted lawyers.[17] That mentor told all of us how privileged we were to be members of the Delaware Bar. That mentor advised each of us that we were not doing our job unless we were working hard to settle at least 90% of our cases. The emphasis from the mentor was on making conscientious efforts at understanding the facts of the case and applying it to the rule of law, and then working hard, well in advance of trial, to attempt to negotiate a settlement, with civility, utilizing our understanding of the facts applied to the rule of law. It was not a sign of weakness to have such an approach to a case, and it certainly saved your client from the financial and emotional strain of dragging a case out to trial. I state this as a reminder to all mentors that it must be said, and to all young lawyers who should hear it now if they have not heard it before. This is the tradition of the Delaware Bar. Perhaps not every lawyer will settle 90% of their cases. But such is a worthy goal. Following the advice of the sage who passed this on to this Judge and other newly admitted Delaware lawyers almost 30 years ago will better serve the citizens of Delaware and our system of justice.

Husband seeks payment of legal fees by Wife of $27,600.00. The Court already adjusted the total from $27,600.00 to $27,400.00 for affidavit preparation adjustments. Of this amount, the Court has already awarded Husband $3,570.00 for incidents specifically described at the beginning of this opinion. Husband is seeking an additional $23,830.00. Recognizing that Wife has already been sanctioned considerably on the division of property and any possible alimony issues, with consequent likely sizeable value and benefit to Husband, noting the incivility that both attorneys practiced towards each other thereby deterring a settlement negotiation atmosphere, which increased fees for both sides, and, noting the 18 month delay of Husband's expert to provide a copy of the valuation of the logging business which prevented the parties from entering into meaningful and knowledgeable property settlement negotiations sooner, the Court finds many good reasons to reduce Husband's claim for attorney's fees. However, the one additional factor which remains against Wife and/or her attorney alone was the unwillingness to provide correct information, and clear, timely and straight for-

17. The Court has previously noted this philosophy in *A.L.M. v. T.C.M.*, 2001 WL 1773730

(Del.Fam.Ct., 2001).

ward responses to the generally appropriate inquiries by Husband's attorney. Such bad faith in negotiating merits the award of an additional $5,000.00 against Wife. Wife is therefore directed to pay $8,570.00 of Husband's attorney's fees. This amount shall be deducted from the previous amount Husband was ordered to pay Wife in order to reach an equitable division of their marital property.

IT IS SO ORDERED.